UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFF J. WALBY,

                    Plaintiff,

                                                    Case No. 11-CV-13312

vs.

                                                    HON. GEORGE CARAM STEEH

AVIVA USA,

                    Defendant.
_____/

OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DOC. 46]

      This breach of contract claim relates to an equity index life insurance policy

issued to plaintiff Jeff Walby by AmerUs Life Insurance Company, the predecessor to

defendant Aviva Life and Annuity Company ("Aviva").  The matter comes before the

court on defendant Aviva's motion for summary judgment.  For the reasons stated

herein, defendant's motion for summary judgment is GRANTED.

FACTUAL BACKGROUND

      On June 28, 2002, Dr. Walby purchased a Flexible Premium Adjustable Life

Insurance Policy.  The policy at issue provided for a death benefit upon Dr. Walby's

death, as well as a build-up of cash value during his life.  The cash value increased as

the Standard & Poor 500 Equity Index ("S&P 500") increased, but did not decline when

the S&P 500 declined because the policy did not involve the actual investment of funds

in the S&P 500.  The policy imposed a maximum to the cash value accumulation such

that the insured would not receive the full market return when the S&P 500 increased

more than the policy maximum, but in exchange the insured would obtain safety from a

decrease in cash value when the S&P 500 went down.

Dr. Walby testified that he purchased the policy to obtain a tax sheltered build-up of cash value.  Dr. Walby purchased the policy by entering into an Ownership Agreement with former co-defendant Executive Benefit Group ("EBG").  Under this agreement, Walby's share of the policy's death benefit was limited to the cash value he built up in the policy, net of loans.  As agreed to by Walby, the death benefit belonged to EBG.  (Ex. O, Ownership Agreement for Life Insurance Policy).  The death benefit was up to $3.825 million, depending on Walby's age at his death.  Twice Walby exercised his right under the policy terms to take loans against the case value, borrowing a total of $1.17 million.  EBG settled Aviva's claims against it, and provided a release to Aviva.

The policy provides that the insured may borrow from the net cash value, at an interest rate determined by the policy.  The maximum loan amount was defined in the policy as follows:

The maximum amount available for a policy loan is

a) the net cash value as of the date of the policy loan, less
b) the loan interest to the next policy anniversary, less
c) a premium sufficient to keep the policy in force to the end
of the current policy year[.]

If an insured borrowed the maximum loan amount, additional premiums or loan repayments would need to be made at the end of the policy year to keep the policy from lapsing because of the need to fund both loan interest and cost of insurance for subsequent years.

The policy defines cash value as the account value less the surrender charge. The surrender charge refers to Aviva's entitlement to recover administrative costs if the policy is surrendered by the insured before such costs have been recovered.  Net cash

value is defined as the cash value of the policy less any outstanding policy loan. (Policy, p. 12). Dr. Walby's policy anniversary date was June 28.

In 2006, Dr. Walby made a request to withdraw the maximum loan amount from his Aviva policy, and received a loan of $656,137.60. He invested half the money in an Exchange Traded Fund of silver and the other half he used to purchase actual coin silver. Eventually Walby sold his interest in the Exchange Traded Fund and put all the proceeds in coin silver. Walby kept the policy in force, without lapse, by making additional cash premium payments into the policy, combined with equity index earnings because the S&P 500 was going up at the time.

On June 28, 2008, Dr. Walby made a second request for payment of the maximum loan amount that had been built up since his prior loan. On July 29, 2008, Walby received a loan of $514,706.27. Dr. Walby used this loan to purchase additional coin silver.

In calculating the maximum loan amount that Dr. Walby could borrow as of July 29, 2008, someone at Aviva made an error, resulting in a loan which was $58,000 more than the limit Dr. Walby was entitled to under the terms of the policy. As loan interest and monthly cost of insurance amounts were deducted from the policy's cash value, the net cash value was used up. On September 28, 2008, Dr. Walby was sent a Notice of Late Payment informing him that he needed to pay a $22,133.01 premium into the policy to keep the policy in force. He was given a grace period of 60 days to provide these funds. Dr. Walby contacted Aviva representatives for an explanation and requested that Aviva provide him with an accounting so he could confirm the accuracy of the amount he needed to pay to keep the policy in effect. Aviva did not provide an

accounting, and after the grace period expired on November 27, 2008, the policy lapsed

pursuant to the terms of the Late Payment Notice.

On November 30, 2008, Aviva sent Walby a Reinstatement Offer, which Walby

did not accept.  Then, on December 17, 2008, Aviva sent Walby a letter responding to

Walby's request for an explanation as to why Aviva failed to withhold sufficient funds to

cover policy costs at the time of the second loan.

> On the "Policy Loan Form" (copy enclosed), which you signed on July 29,
> 2008 you requested a "Check for Maximum Loan Available".  Because you
> did not specify that you wanted us to retain enough value in the policy to
> cover the policy costs to any given point in time, we sent you a check for
> the maximum that was available at that time.

The letter ended by stating that if Walby paid $35,552.00 by January 2, 2009, the policy

would be reinstated.

On December 31, 2008, Walby sent Aviva a letter again requesting a full

accounting, including "a complete printout of all contributions I have made, all payments

made by your company to my policy on my behalf, with all dates involved.  Include all

debits to my account for life insurance premiums, including the reduction in premiums,

once my coverage was lowered."

Aviva's Kathy Harmon responded to Walby's letter on February 27, 2009, offering

some answers to Dr. Walby's questions, and including a document titled "Accounting

History".  The timing of Walby's receipt of the accounting history was clarified through

briefing requested by the court following oral argument on the motion for summary

judgment.  The accounting history is Exhibit G to defendant's motion for summary

judgment.  Walby admits to receiving the accounting history from Aviva on March 6,

2009.

Still unsatisfied by Aviva's explanations, Dr. Walby filed a complaint with the Office of Financial and Insurance Regulation ("OFIR") for the State of Michigan. Aviva's first response was that it had done nothing wrong. (September 18, 2009 Letter, Exhibit M). In a second letter to OFIR, Aviva affirmed it was not at fault, stating "we did not fail to retain the amount necessary to meet the loan parameters prior to sending the policy owner the maximum loan available." (December 16, 2009 Letter, Exhibit N)). OFIR requested that Aviva provide further explanation, and Aviva finally acknowledged the basis of Walby's complaint:

> You have asked for an explanation of why Aviva does not retain premiums sufficient to keep a policy in force prior to a loan distribution which is in direct conflict with the policy language and conditions. When processing a loan, the administrative system does hold out policy costs until the policy anniversary following the date a loan is processed. Therefore, the loanable amount is reduced by the costs to maintain the policy until its next anniversary. When Dr. Walby's loan was processed for the maximum amount on July 29, 2008, the administrative system did not hold out policy costs prior to processing. It is not clear why this occurred, as several other policies on the same system were reviewed and values to cover costs until the next anniversary were consistently withheld. Because the policy is no longer in force, values are no longer obtainable and we are therefore not able to confirm the cause of this inadvertent omission.

(March 8, 2010 Letter, Plaintiff's Exhibit O).

Dr. Walby continued to request an accounting, and although Aviva had already provided the accounting history and additional explanation, Dr. Walby was still not satisfied. Aviva also made another reinstatement offer on July 26, 2010, without evidence of insurability, upon payment of $61,075.92 by Walby. Dr. Walby and OFIR continued to request an explanation, to which Aviva stated, "[t]here are no worksheets or documents to provide Dr. Walby that would show how the maximum loan amount was calculated." (July 29, 2010 Letter, Exhibit T; February 14, 2011 Letter, Exhibit U).

OFIR did not take any action against Aviva.  On June 27, 2011, Dr. Walby filed this breach of contract claim.

The coin silver investment made by Dr. Walby with the proceeds from the second loan increased in value from $514,706 on July 29, 2008, to a value of $1,087,020 as of July 16, 2012.

<u>STANDARD FOR SUMMARY JUDGMENT</u>

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial."  *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

<u>ANALYSIS</u>

I.  <u>Contractual Injury</u>

The elements of a breach of contract claim under Michigan law are (1) the existence of a contract between the parties, (2) the terms of the contract require performance of a certain action, (3) a party breached the contract, and (4) the breach caused the other party injury.  *Burton v. Beaumont Hosp.*, 373 F.Supp.2d 707, 718 (E.D. Mich. 2005) (citing *Webster v. Edward D. Jones & Co.*, 197 F.3d 815, 819 (6th Cir. 1999).  While the amount of damages is usually a disputed issue of fact for trial, the existence of some contractual injury or damage is a necessary element for purposes of stating a claim for breach of contract.  *See New Freedom Mortgage Corp. v. Globe Mortgage Corp.*, 761 N.W.2d 832, 837 (Mich. App. 2008).

The breach of contract pled by Dr. Walby is that Aviva provided him with a loan amounting to $58,000 more than the maximum he was entitled to obtain.  According to Walby, this overpayment was a breach of contract which resulted in the lapse of the policy.  Dr. Walby seeks his expectation interest, that he be placed in the same position he would have been in if Aviva had fully performed its obligations under the contract. *Jim-Bob, Inc. v. Mehling*, 178 Mich. App. 71, 98 (1989).  Walby contends that the proper measure of damages for the wrongful breach by the insurer of a life insurance policy is the face value of the policy less any outstanding indebtedness owed by the insured to the insurer.  44 Am.Jur.2d Insurance, § 1458.  The policy in this case had a potential death benefit of $3.825 million at the time of the alleged breach.  The outstanding policy loan balance at that time was $1,239,119.47.  Therefore, the amount payable on the death of Dr. Walby was $2,585,800.53.  Dr. Walby contends he suffered contractual damages of $2,585,800.53, plus $182,709.74 (prepaid interest, improper keeping of the surrender charge, and 6% guaranteed returns), for a total of $2,768,510.20.

Dr. Walby has a skewed view of this case.  The maximum loan provision in the policy is there to protect Aviva from a breach of the policyholder's legal duty to maintain some net cash value.  While Aviva had the administrative duty to determine the maximum loan amount, and loaning extra money was a mistake on the part of Aviva, it was not a breach of any contractual provision since the policyholder received the money.  The overpayment in this case did not cause Dr. Walby any financial damage -- he received the money and he invested it profitably.

"The law will imply a promise to repay money paid under mistake of fact which in justice and good dealing should be paid back." *Brenner v. Niver Parsons Corp.*, 250 Mich. 81, 82 (1930); see also *Hollowell v. Career Decisions, Inc.*, 100 Mich. App. 561,

570 (1980).  Equity will allow recovery where the "payment is made voluntarily if it is made under a mistake of material fact, even though the mistake is unilateral and due to a lack of investigation."  *Montgomery Ward & Co. v. Williams*, 330 Mich. 275, 284 (1951).

Regarding the loss of the death benefit when the policy lapsed, Walby no longer had a right to the death benefit once he contracted it away to EBG.  The death benefit was not an element of Walby's expectation interest.  He did not control the death benefit if he died while the policy was in place, so he has no claim to such benefit now.  The remedy for a breach of contract action is to make the non-breaching party whole by placing such party in as good a position as if the contract had been performed.  *Corl v. Huron Castings, Inc.*, 450 Mich. 620, 625-26 (1996); *Roberts v. Farmers Ins. Exchange*, 275 Mich. App. 58, 69-70 (2007).  As a result of the over-loan made by Aviva, *even if* such could be considered a breach by Aviva, Walby was in a better position than if the contract had been performed as written.

Defendant's motion for summary judgment is GRANTED because plaintiff is unable to demonstrate that the alleged breach of contract caused any injury.

II. Failure to Mitigate

Assuming the over-loan by Aviva was a breach of contract, and that Walby suffered contract expectation damages as a result of such breach, Walby's failure to mitigate his damages would be fatal to his breach of contract action.  Damages recoverable for breach of contract are those that naturally arise from the breach or those that the parties contemplated when the contract was made.  *Harris v. Citizens Ins. Co.*, 141 Mich. App. 110 (1983).  Dr. Walby contends that the lapse in the policy and the

loss of the death benefit arose naturally out of Aviva's failure to withhold sufficient funds to keep the policy intact.

The Michigan Court of Appeals has held that a party's failure to mitigate damages allegedly caused by the other party can cut off legal causation. In *Farm Credit Services of Michigan's Heartland PCA v. Weldon*, 591 N.W.2d 438, 446 (Mich. App. 1998), the plaintiff brought suit against defendant farmers who defaulted on a loan. The farmers counter-claimed that plaintiff had acted in bad faith by failing to remit a portion of a check to another one of their creditors. That creditor had extended the due dates of the farmers' mortgage payments. The jury found for the farmers, but the Court of Appeals held that the farmers could not recover because they had failed to show sufficient legal causation as a matter of law, and because they failed to mitigate damages.

> Thus, where defendants' own inaction intervened, no legal causation exists between plaintiff's refusal and the eventual foreclosure on the defendants' property. Furthermore, defendants admitted they could have borrowed money and paid the [creditor] themselves. Therefore, defendants' failure to mitigate any damages allegedly caused by plaintiff's refusal also precludes the jury's [damage award].

*Id.*

In this case, the policy lapse was caused by Dr. Walby's failure to comply with his duty as a policyholder to maintain a positive net cash value in his policy. (Defendant's Exhibit L; Sharon Filas Affidavit)  Walby believed the market was going down, so he took as much money out of the policy as possible to invest in coin silver. He admittedly could have paid the money needed to raise the net cash value of his Aviva policy to the required level, but he felt that was unreasonable without a satisfactory accounting from Aviva.

-10-

Walby had an accounting from Aviva in his possession by March 6, 2009.  He concedes he was over-loaned money, but characterizes the over-loan as a breach of contract by Aviva.  Walby does not dispute any of Aviva's calculations, he just argues that it would be unreasonable for him to pay the amount demanded for reinstatement of the policy without more in the way of explanation by Aviva.

This is the point in time by which Walby needs to specifically dispute the accuracy of the information contained in Exhibit G, the $58,000 over-loan figure, or any of the figures in the deficiency notices.  This has not occurred.  Walby's position is summed up in the conclusion of his supplemental brief: "The history of relevant actions in the fall of 2008 into 2009 reflect Dr. Walby did not have sufficient information such that he could be reasonably assured that, if he paid the monies Aviva wanted, all monies would have been properly accounted for and due Aviva."  (Doc. 62)

Aviva pled the affirmative defense of failure to mitigate in response to Walby's complaint.  A plaintiff must make every reasonable effort to mitigate damages. *Edgecomb v. Traverse City School Dist.*, 341 Mich. 106, 115 (1954).  Proof of plaintiff's failure to mitigate rests upon the defendant.  *Hughes v. Park Place Motor Inn, Inc.*, 180 Mich. App. 213, 220 (1989) (citations omitted).  In this case, the evidence demonstrates that Aviva made two reinstatement offers prior to March 6, 2008, and then made a third offer to reinstate the policy without evidence of insurability on July 26, 2010, after Walby had the accounting history in his possession.

Assuming the over-loan was a breach of the contract terms by Aviva, it provided Walby with the accounting history of his policy as evidence to support the deficiency figure calculated in order to reinstate the policy with no other harm suffered by Walby (ie, no evidence of insurability required, he invested the over-loan proceeds at a

-11-

overwhelming profit, he could have paid the deficiency under protest while gaining assurance that the accounting history was accurate).  Walby then had a duty to mitigate his damages by paying the deficiency to have his policy reinstated. A failure to mitigate on the part of Walby is an affirmative defense to recover damages for any breach of contract committed by Aviva.  Walby's main argument, that it was unreasonable to expect him to pay the deficiency without an accounting from Aviva, falls apart in light of the fact that an accounting history was provided by March 2009.

<u>CONCLUSION</u>

For the reasons stated above, defendant's motion for summary judgment is GRANTED.

Dated:  January 15, 2013

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

| CERTIFICATE OF SERVICE |
|---|
| Copies of this Order were served upon attorneys of record on January 15, 2013, by electronic and/or ordinary mail.<br><br>s/Marcia Beauchemin<br>Deputy Clerk |